I'm on the clock, so if you wish to speak in rebuttal, be sure to save some time by stopping your argument before the clock expires. And with that, we'll hear from Mr. Schillingstad. Good morning, Your Honors. May it please the Court, Counsel. My name is Hal Schillingstad. I'm one of the attorneys for Jones Lang LaSalle Americas and the lawsuit commenced by Todd Karlen. Your Honors, we are here today on the appeal of my client Jones Lang LaSalle Americas with respect to the trial court's grant of summary judgment in favor of the plaintiff pursuant to her order of May 23, 2013. With respect to the argument that we presented in the majority of the briefing, I'm going to dive right into what I think is the majority of the briefing and the main issue with respect to this, and it goes to the issue of commissions and when they were earned in this case. The trial court had found that my client had violated two particular Minnesota statutes, 181.13 and 181.03. Under both of those statutes, those are timing statutes, as we pointed out to the court with the Lee-Furniss case. However, with both statutes, the language of the statutes is very important, we believe, for this argument and which warrants reversal of the trial court's ruling in this case. In particular, under 181.13, the timing of that statute to trigger liability and to enter the protection of that statute, it deals with commissions actually earned and unpaid at the time of discharge. In this case, the time of discharge is January 31, 2012. Under 181.03, again, that statute, in order to trigger liability with regarding the altering of the method of payment, which the trial court found here, is that it regards payment of commissions earned through the last day of employment after the employee has resigned or been terminated. In both of these instances, Your Honor, the critical time period with respect to analyzing statutory liability is January 31, 2012, when Mr. Carlin was terminated. On that day, the issue that the court found my client liable for is for payment of the prime bar commissions that were a result of a lease that was actually signed following Mr. Carlin's termination. The controlling document with respect to how Mr. Carlin was paid was the compensation memo, which was issued on January 27, four days before his termination. As of the date of his termination, there were no commissions owing Mr. Carlin with respect to the prime bar deal. There was no signed contract. There was no liquidated amount of the commission. Indeed, I find it notable with respect to this case, with respect to the amount of the commission, which the court has read about in the parties' respective briefs, there was a fight over basement space and first floor space and some dispute on what the amount of the commission should be. In this case, Mr. Carlin thought his commission should be $37,000. The court found and rejected plaintiff's argument with respect to his request for the basement space that his commission was only $34,000. I think this underscores that the nature of the agreement and the specifics of the agreement to arrive at a liquidated amount were not known and determined as of January 31 of 2012 when Mr. Carlin was terminated. As such, it is our view that the statutory liability under 181.13 and 181.03 does not stand. Let's examine the record in this case. I believe that if we examine the record of Judge Erickson with respect to her order, which is a page and a half, as well as the transcript of the oral argument, nowhere in any of those documents or any of those proceedings do we find any record of the court determining when Mr. Carlin earned his commission with respect to the prime bar. What exactly do you say the court should have done? I think what the court should have done is determine, first of all, when was the commission earned? I believe the court . . . On what? Was there a motion about this pending with the court? Yes. Our client had brought a motion for summary judgment seeking dismissal. And the court granted summary judgment the other way, sui sponte for Carlin. Correct, on the day of the hearing and wake of plaintiff's office. So you say it's a legal issue. You don't think there's a fact issue here as to whether the commissions had been earned? Well, we believe fundamentally that our summary judgment motion should have been granted with respect to these statutory claims because the commission had not been earned and was not owing as of the date of its termination. I think that's a yes, then. You say it's a legal question one way or the other. There's no fact issue? Well, obviously our backup position is if the court finds that the record is incomplete in some way and has to be remanded for further factual findings, we would urge that as well to set aside the trial court's ruling. We believe based on the record, however, and in our moving papers, it was a legal issue that could be determined as a matter of law based upon the record that was before the court. Yes. Is there any dispute about the compensation agreement that you've described as being entered on January 27th? Do the parties dispute whether that applies? No, Your Honor. But that doesn't say much about when the commissions are paid. As I understand it, you rely on what you call the company standard practice or typical practice. Well, in part, Your Honor. I think what we do rely on, and I think Judge Erickson's, if you look at the transcript, she focused on the term revenue. Under the compensation agreement, it is when the commission is triggered when revenue is paid or when revenue is earned by the company. And Judge Erickson took great pains with the counsel at the oral argument on the summary judgment motion. Where does it say that? Where does it say that? On the compensation memo? You say that in your brief, but where does it say that the commission is triggered by revenue earned by the company? Well, the comp memo says employees are eligible to earn a commission up to 30% of leasing revenue you directly earn. That's the quote. All right. That doesn't say revenue earned by the company. No. That's what you just said a minute ago. What does it mean to say revenue you directly earn? Because the individual never earns any money directly. As I understand it, the party that leases the building wouldn't pay Carlin directly. Correct. So what does it mean to say revenue you directly earn? Well, based upon the contract, it was our position, and I guess getting into Your Honor's prior question, that's where the practice came in, which was implemented shortly after Mr. Carlin's termination, which was. All right. So how is that relevant if it was implemented after his termination? Why is that relevant? Two reasons. One, the default position with respect to a compensation agreement on commissions on whether or not something is earned or not is, first of all, at the point of termination, an employee is not entitled to commissions in the future unless the agreement says so or if custom and practice dictates that people are entitled to commissions following their termination. So here it's relevant because following his termination, the custom and practice of the company is that commissions would be earned upon the signing of the agreement and receipt of the company of the funds, undisputed fact, and. Why is that undisputed? Because even Mr. Carlin had acknowledged that he would not get paid until the company would receive its money from the client in this case, the company that was leasing the space. Is that per testimony in a deposition? Yes, and we cited that to the court. I believe it's in our appendix on J32. Mr. Carlin's testimony is that he only earned a commission on revenue received by JLLA. What do you have to say about this Holman case from the Minnesota Court of Appeals where we have to apply Minnesota law? Is that a similar scenario where the compensation plan didn't define actually earned and the Court of Appeals says it was a question of fact? Well, I think the Court of Appeals, with the record they'd had before it, found there was a question of fact. And certainly when there's ambiguities with respect to the agreement itself, which is the first step in an analysis in a commission's case, in that instance the court does look at the agreement and in that determination they felt there was a question of fact. But I would have thought that if your position is correct, that that case should have come out for the employer because, as I understood the facts, the parties had substantially agreed upon a sale but hadn't signed anything. And it seemed analogous, but maybe you see a distinction. Could you address that? Yeah, I do, Your Honor. I think that that line of cases with Holman, Rosenberg, those are all kind of those procuring cause type cases where you substantially get down the road of an agreement. The case law in the Rosenberg case, which is a Supreme Court case on this, looks at the procuring cause factor and has only really applied that in the real estate broker situation. Moreover, that has been deemed an equitable cause of action in the absence of a controlling agreement. In addition, with respect to procuring cause analysis, that analysis requires some element of bad faith. I understand that on procuring cause and equitable cause of action, but Holman was a 181-13 case. Now, it's a court of appeals case. You may say it's not the best predictor of what Minnesota would do, or maybe it's distinguishable somehow. It's not really clear what the court thought was the fact issue, but . . . I couldn't decipher it either, Your Honor, to be . . . That's what they say. It's just sort of a conclusory paragraph, no disrespect intended. Yeah, far be it for me to second guess how the court came down there, because I wasn't familiar with the record on that. They did find a fact issue, and I think that if you do find a fact issue with respect to the agreement here, you could on when it's earned. However, I don't believe there's anything within the record before the court, and even within the agreement itself, that would establish that Mr. Carlin was owed, had earned, and was to be paid a commission on the date of his termination. That is our fundamental point, and that was our motion. The way the statute works, is this correct, that he can make a demand and the company has to pay within 24 hours? Yes. If you read the statute, the purpose of the statute . . . So what Judge Erickson is saying is that if he had made the demand on the day he was terminated, JLL was obligated to pay within 24 hours. Is that the ruling of the district court? Well, I think if the court would look at Judge Erickson's order with respect to the attorney's fees issue, Judge Erickson was of the opinion that Mr. Carlin did not even have a cause of action on the day he sued the case in April of 2012, because Judge Erickson felt that Mr. Carlin, and this is in the attorney's fees order, that I think the court can look at, because it adds more meat, I think, with respect to Judge Erickson's analysis. With respect to Judge Erickson, she said that Mr. Carlin, none of his claims were meritorious on the date he brought his lawsuit. There was no evidence that any payments to Carlin were delayed. That's how Judge Erickson felt with respect to the fact issue, if you will, on the time of his termination. So, yeah, I think that's what Judge Erickson thought. The point with Judge Erickson, I think she started with the predicate that there was some condition placed on the payment and then worked backwards. We believe the analysis should go to the date of termination and sort out the facts on there and whether something is due in owing. I want to be mindful of my time, Your Honors. I have two minutes left, so I'll reserve the remainder of my time. Very well. Thank you. Mr. Schillingstad, Ms. Miller-Van Oort, we'll hear from you. Ms. Miller-Van Oort. May it please the Court, Counsel, Sonia Miller-Van Oort, on behalf of Apolli Todd Carlin. I would just like to address three points in response to the arguments that were made. First, I'll address the issue relating to Mr. Carlin's prime bar commissions being earned prior to his termination. Second of all, I'd like to touch on the conditional payments. And third of all, I'd like to address the new argument that's raised on appeal about some subsequent agreement being made by the parties, if there's time to do that. First, Your Honor, I think we're all focused on the right issue, which is when were Mr. Carlin's commissions earned and did that happen before he was terminated or not. What the case law says is we need to look at the actual agreement itself to determine what's the commission-generating event. And as Your Honor has aptly pointed out, if we look at the compensation memo, which is undisputed as what is governing here, it's really quite vague and all it tells us is that the commissions that Mr. Carlin was to earn is 30% of the leasing revenue he directly earned. And to address leasing revenue quickly, leasing revenue in the context of this case, and it's cited in the record, meant if a leasing specialist goes out and secures a lease, let's say it was $1,000 a month times 12 months, the leasing revenue or the value of that lease would be $12,000. So in this context, he was to get 30% of that leasing revenue, the value of the leases that he helped secure. What I'm struggling with is how could he have earned any revenue on the date he was terminated if there was no agreement yet with the leasing party? Well, there was an agreement, Your Honor. What the facts in the record demonstrate is that as of December, I'm sorry, as of January 31st, the deal had already been done with Prime Bar. There were no other details remaining to be negotiated. It had been done.  It was out for signature. Was it binding on Prime Bar at that time, or could they have changed their mind? Well, could they have changed their mind? Maybe that's possible. But what the testimony in the record is, and it's undisputed, Your Honor, is that it had been finalized. It was coming up on a weekend. There were people not available to sign, and they were just waiting for execution. So it was a deal that was in place and finally negotiated. And for that reason, it was ascertainable at the time of his termination exactly what the leasing revenue was that was to be attributed to him. So do you think it has to be a legally binding agreement at the day of termination? No, Your Honor. I don't think that it does. Again, going back to what the case law was. The problem with that is suppose Prime Bar had changed its mind over the weekend. These guys thought it over and got a better deal somewhere else or changed their minds. Your position is that your man was entitled to a commission even though no deal went through. How is that? How could that be? Well, again, the record, Your Honor, demonstrates the deal did go through. Jones-Langlaisel has never disputed that it went through. Jones-Langlaisel has never disputed Mr. Carlin's testimony that the deal terms were finalized. And when the case law says to determine when it was earned, we have to look at the agreement. When we look at the record at J6566, it doesn't tell us. All it tells us is the amount of the commissions. It doesn't tell us when the commissions are earned, and it doesn't tell us when the commissions are to be paid, which can be two different things. What is also clear on the record, Your Honor, is that Jones-Langlaisel sent three different checks to Mr. Carlin in the course of litigation. And what's important about that, Your Honor, is that the corporate designee testimony, which is on the record relating to those checks, was as follows, and this is at J92 in the appendix. The corporate designee was asked first about the first check, which is dated May 4, 2012. And she was asked, what is your understanding as to why this check was issued to Mr. Carlin? And the corporate testimony answer is, it appears that it would have been based on the commission that we felt he was entitled to. But that doesn't speak to the timing. Maybe they felt he was entitled to a commission once the deal was signed. Well, the testimony further by this corporate designee is that whether or not he earned it did not depend on whether or not he was terminated or still employed. And that matters, Your Honor, because under- But that's still not inconsistent with their position that he earned it when the deal was signed. Well, Your Honor, I think we- Whether he was terminated or not. The contract itself is ambiguous as to when it's supposed to be earned. They're saying it was supposed to be earned when the lease was signed. This contract does not say that. Well, there's even another interpretation, isn't there? And that's that it's earned when the money is received by JLL. That could- By JLL. That could be an interpretation. In fact, that's an interpretation that Carlin alluded to in his deposition. Well, I would- That's 33 of his deposition. He gave an example. If JLL received $100,000, he would get 30. Well, Your Honor, I would maintain that the context of that testimony is kind of- It's taken out of context. The question was, and I'm also looking at J32 in his depo transcript at 33. The question was, okay, so I guess explain to me what you understood about how the structure was going to change. And his full answer is, my understanding is that salaries were going to be lowered and commissions were going to now go into effect versus a bonus structure. So my deal going forward, you'd make 30% commission on the JLL commission. It doesn't say when they received. And it's twisting a little bit out of context what his testimony was to take that interpretation. Read the next sentence. And the next sentence, he gives an example. So if they received $100,000, I would receive $30,000 of it. That's true. So you've got another interpretation of this contract, this exceedingly vague and ambiguous one-page agreement. So isn't there at the very least, are there remaining questions of fact in this case? I don't believe there are, Your Honor. Again, if we look at what Minnesota precedent is, when we've got a vague contract like this and we look at case law and try to find out how the courts have ruled on this, if, one, the contract is vague and, two, there's no custom and practice, I know they argue that there was, but there wasn't. Because at the time that this went in effect on January 27th, he was terminated on January 31st, there was no custom and practice in place. So we don't get the answer from the contract and we don't get the answer from custom and practice. We look at Minnesota case law. Now, the cases that appellant has cited, all are examples where there is a specific contract with specific terms. In the Friedenfeld case, there was a contract that actually defined the commission-generating event as payment by the lease client. We don't have that here. In Lee v. Fresenius, we have a handbook that clearly states that if the employee resigns without proper notice or is terminated for misconduct, they don't get the PTO. It's clearly defined. We don't have that here. In the Feeblecorn case, there's a very detailed written plan talked about in that case that provides that commissions are not earned until X, Y, and Z happen. Again, very clear. And that court reasoned that nothing in the record indicates the plan continues in effect post-termination. Not this case. So we look to the wages case, Your Honor, which is what we have cited here. The wages case is very analogous. It's a situation where you've got a contract defining a percentage for commissions, but it doesn't define the commission-generating event. And in that case, then, the employee's argument that he was entitled to commissions for work that he had done while he was on the job, even though his employer had not yet received payment for those services. Very similar to what we have here. And the wages court reasoned that at the time of the employee's last day, the amount of the receivables relating to his work was known, and that it was an error for the district court to conclude that under the contract, the employee had earned commissions on receivables relating to his services performed on his job. And they found in that particular case of the employer that refusal to pay the commissions was a violation of 181.13. Here we've got pretty much the same scenario. We've got a contract that's silent as to when the commissions are earned. Well, the arguable distinction is that in the wages case, the third party had an obligation to pay the employer at the time the employee was discharged. Here, I thought you acknowledged earlier, there was no legally binding contract with Prime Bar at the time of the discharge. The lease had not yet been executed. That's true, and that's undisputed, and that is what the record is. But, Your Honor, we know that that went forward. And if we talk about equity in terms of this employee performed the services, he procured the deal, the deal was done, we're waiting for signatures over the weekend. What fairness is there in that, that he not received commissions for that work? Well, they're not saying he shouldn't get a commission. They're just saying it wasn't owing on the date of the discharge, so he's not entitled to these statutory remedies. As I understand it, is that wrong? Or I thought the company is saying he gets his commission. I sent him the checks, and they're saying, you know, if you want to debate about the basement or whatnot, you can debate that. But they're giving him a commission.  So I'm not going to speak on behalf of their company. Can't he still cash those checks? He doesn't have the checks. They've been returned, and he couldn't cash them at the time they were sent because of the conditions that were put on them. So to this day, Mr. Carlin has not received any payment for the work that he did in 2012. All right. I thought they had acknowledged that he's entitled to a commission. The only time that I would say that they have acknowledged that was after the suit was filed, and they tried to send him checks, which they put conditions on saying, but you can't cash those checks if you don't agree that you're waiving your other any claims you have. So- What was the extent of that condition? It wasn't clear to me whether it was a condition on this particular payment for Prime Bar or whether it was a condition, because at that point, he had a number of other claims pending for different commissions and bonuses, right? It was his understanding the condition was just as to the Prime Bar commission? You can't fight about that, or you can't fight about anything else? So the understanding, and where the record sets us forth is at J113 and J115, and that was communications with counsel, was that on May 6, 2012, there was a payment issued for $6,500, approximately, that shows on the paycheck stub, it's for commissions of $10,000. At that time, the condition that was put on that is if you cash that check, we, being Jalen's linguist, I'll maintain that that's 50% of the commissions that we owe Mr. Carlin. On Prime Bar? On the Prime Bar deal. So it was a limited condition just as to Prime Bar. So when they said, well, we're just trying to stop him from getting double recovery, you can't recover twice on the same commission? Yes, Your Honor. It was limited to Prime Bar, but the problem with that is Mr. Carlin believed he was due $38,000. Ultimately, the court determined it was $34,000. But in either event, half of that number, even if you take the smallest number, is $17,000, and they were only giving him $10,000. So by cashing the check, he was put in the position of waiving about $7,000 of commissions he thought was due. Actually more, because he thought more was due than that. Let me ask you one question about the attorney's fee order. I know we'll talk about the fee issue later itself, but on this question, the district court does say that when Carlin commenced the lawsuit, he was not yet entitled to either of the payments. At the time he brought the suit, his claim that he was entitled to these payments was factually and legally unsupported. Now, is that inconsistent with the court's ruling that he had already earned the commissions? It is difficult to reconcile. First of all, I would say that the order on the fee order, which is issued in July 1, I don't think that we can fairly take the reasoning there and say that was the court's reasoning in May. She certainly didn't put that in her order, and I can't reconcile what she did. But what I will say, Your Honor, is under the statute, if those commissions were in fact earned, and the employee, Mr. Carlin, made a written demand for those commissions, which he did and which are on the record at J82 on February 20, 2012, that's when the time started running. That's when he had a right to that money. He was supposed to get it within 24 hours, and there is no dispute that at February 20, 2012, that lease deal had been done. Everybody knew how much was due on it. And so on that basis, Your Honor, I think that it's clear at that point what he should have been paid. I know we're not really reviewing the district court's order in this case, but it's a very short order, and it says, for the reasons stated on the record, then it proceeds to grant the relief. Could you refer us to where in the record the district court sets forth these reasons? You mean with regard to her summary judgment order, Your Honor? Yes. I don't know that she's . . . I don't find any reasoning. When I look at the transcript of the hearing and the court's statements, it seems to me the court jumped to the conclusion and doesn't really give us much in the way of reasoning. If I may answer your question, I'm out of time, but if I may answer the question. Yes. Well, I think it is difficult for us to know exactly what the judge's reasoning was, but what I think the reasoning was and what I think was the basis of the discussion at that hearing was there were three payments that were made, and it was an acknowledgment that there was something due to Mr. Carlin, but they were conditioned. I know you may think that, but is that what the court said? Well, the court comes to the conclusion that those commissions were earned, and I think the undisputed facts on the record, Your Honor . . . Does the district court provide us any reasoning? We only have what Judge Erickson put in her opinion. So, no, I think it doesn't elaborate more than that. We only have what was on the record at the hearing and the briefs that were submitted as to what she was relying on. Very well. Thank you for your argument. Mr. Schillingstad, you have a little time for rebuttal. I'll just highlight a couple points. With respect to the wages case that was referenced by a plaintiff's counsel, as well as the other cases, those cases, notably, are all the result of jury trials, I believe. There was some fact dispute that had to be sorted out with respect to the details. The wages case is also notable because there, with respect to the obligation to pay the plaintiff in that case, they looked at receivables that were in existence at the time of termination. Again, I reiterate our point with respect to that key point in time under the statute that has to be analyzed as the beginning point, we think, for the analysis, which gets to our point that I ended in my last remarks, was that I believe the court started with the predicate and then worked backwards. Again, to reiterate what I . . . Let me make one final point, and then I'll conclude. With respect to the checks, these checks are confounding. Judge Erickson had ordered that Mr. Carlin cash the checks in the order, I think, if you review the transcript. The checks get sent back to us in the context of this appeal, so this claim that they've never been paid, I don't know how to get this resolved for them to cash the checks. Well, what is JLL's position as to whether he's entitled to a commission? Not whether it was earned at the time of discharge, but whether he's entitled to a commission on this prime bar deal. He's entitled to a commission on the prime bar deal. Okay, and in the amount of what? $34,521, I believe is the number. So the company's acquiescing in the number the judge came up with. Yep, and that's the dollar amount that was paid to Mr. Carlin. He just doesn't cash the checks. It was paid in those checks. I thought she just said the first amount was only $10,000, which was less than the half. Yeah, there was, if you look in the record, there's that confusion where the legal department had issued, there's three checks, there should only be two checks, so it came in a piecemeal fashion. There should have only been two checks. So you're saying the three together add up to the $34,000?  They just have to cash the checks. So with that, we would request that the trial court's order granting summary judge in favor of the plaintiff be reversed. In the first instance, we ask the judge to be entered in favor of JLLA based on this record, and the alternative that it be remanded for further findings due to the various fact issues and ambiguities with respect to the court's order. Thank you. All right, thank you. Those are some of the questions. All right, thank you very much. Why don't we go right into the related case on the attorney fee order, which is docketed second, and Ms. Miller-Van Oort will hear.